UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**ARDEN KASSAB,** an individual,  )
**PHARMACO, INC.** a Michigan      )
corporation,                       )
                                   )
      Plaintiffs,           )
                                   )   Case No. 22 -
v.                                 )   Hon.
                                   )
**CITY OF DETROIT**, a Michigan    )
Municipal corporation             )
                                   )
      Defendant.            )

## Complaint

The Plaintiffs, Arden Kassab, an individual, and Pharmaco, Inc., a Michigan corporation (collectively "Plaintiffs"), submit the following Complaint against the Defendant, City of Detroit, a Michigan municipal corporation ("Detroit").

## Nature of the Case

> If the City were truly worried about equity, the Ordinance would target the individuals who need social equity treatment . . . . But instead, the Ordinance employs a class-based distinction based on duration of residency. It thus prefers wealthy applicants who have had no interaction with the War on Drugs to low-income applicants who have been ravaged by it, so long as the wealthy applicants have lived in Detroit for the right amount of time. As presently drafted, the Ordinance is far more protectionist than it is equitable.[1]

> *Judge Friedman (June 17, 2021)*

---

[1] **Exhibit 1**, June 17, 2021 Opinion and Order Granting Preliminary Injunction, *Lowe v. City of Detroit,* 544 F. Supp. 3d 804, 806 (ED Mich, 2021) at 15.

On June 17, 2021, this Court declared that Detroit's first attempt at an ordinance was "far more protectionist than [was] equitable."[2] Thereafter, on April 5, 2022, Detroit enacted its second attempt.  While Detroit alleges that its new cannabis ordinance cures the constitutional deficiencies found by Judge Friedman, the "Second Ordinance" (as defined herein), however, remains "far more protectionist than it is equitable."[3]

Following this Court's ruling, Detroit should have removed the 'legacy' program from any future ordinance considerations; however, Detroit chose to keep the language merely disguising it within the definition of an "Equity Applicant" *i.e.,* dressing up 'legacy' in a different outfit.  In the Second Ordinance, Detroit artfully crafted the term "Equity Applicant" to ensure Detroit's intent remained - - that all Detroit residents receive a preference to receive an adult-use marihuana facility license.

> At some point, the games must end. We will not back down from the fight to best ensure equity and diversity in Detroit's marijuana industry for our residents. *No matter how many lawsuits are filed or any other attempts to freeze out Detroiters in their own city are made, we as lawmakers must remain bold and courageous in our legislation. This is upsetting to some, but Detroiters deserve to truly be able to compete and be successful in this industry –* both today and tomorrow.

> *President Pro-Tempore James E. Tate, Jr.*[4] *(July 12, 2022)*

---

[2] *See supra* at 15.

[3] *See supra; see also* **Exhibit 2**, Detroit, MI Ordinance No. 2022-11, Ch. 20, Article VI (April 5, 2022) (herein referred to as the "Second Ordinance")

[4] **Exhibit 3**, *Council President Pro Tem Tate Announces Marijuana Licensing Ordinance Updates*, Michigan Chronicle (Jun. 2, 2022), https://michiganchronicle.com/2022/06/02/council-president-pro-tem-tate-announces-marijuana-licensing-ordinance-updates/. (emphasis added).

By way of the Second Ordinance, Detroit has essentially rebranded the 'legacy' program as a "social equity" program. Detroit endeavors to cure the language found problematic by this Court by incorporating the state of Michigan's definitions of 'social equity' and Detroit's interpretation of the State's definition of 'disproportionately impacted communities.' While Detroit alleges the addition of this language cures the issues raised by Judge Friedman and levels the playing field for equity and non-equity applicants, Detroit, notably, did not omit the 'Detroit legacy' program language altogether.  Instead, 'Legacy' status is now an alternative status that is incorporated within the definition of an "Equity Applicant".

It is clear that Detroit merely cloaked the problematic 'legacy' status with the term "Equity Applicant" and revised its schematic to maintain the preference to 'legacy' applicants *i.e.*, Detroit residents.  By way of the Second Ordinance, Detroit designated fifty percent of the available adult-use licenses to these "equity" applicants.  To ensure a preference to Detroit residents, Detroit revised the State's definition of 'disproportionately impacted communities' by using 2019 census data, as opposed to the 2008-2018 census data relied on by the State in determining the 184 communities intended to benefit from the passage of MRTMA.[5]  By utilizing 2019 data, Detroit guaranteed Detroit residents 25 points or 20% of the available points under the Second Ordinance by its subterfuge; thus, ensuring a preference to Detroit residents and eliminating 67 of the 184 intended communities from even qualifying for social equity points as a "disproportionately impacted community".

---

[5] **Exhibit 4**, Email Correspondence from David Harns, LARA – CRA (July 11, 2022) (Demonstrating the state utilized **2008-2018** census data to identify the 184 communities disproportionately impacted by the War on Drugs.)

In sum, even if this Court deems Detroit's facial revisions to the Second Ordinance to be in compliance with Judge Friedman's ruling, the impact of the Second Ordinance remains the same as the first - an unfair preference to Detroit 'legacy' applicants.

On July 29, 2022, the Honorable Leslie Kim Smith in the Wayne County Circuit Court entered a temporary restraining order "enjoining the City of Detroit from accepting applications on August 1, 2022 for Phase 1 Limited Licensing for Adult-Use Marijuana Retailer, Micro-business, and Designated Consumption Lounges pursuant to Ordinance 2022-11." [6] The temporary restraining order was lifted on August 30, 2022. [7] That same day, Detroit announced that it would begin accepting applications for Phase 1 Limited Licensing for Adult-Use Marijuana Retailer, Micro-business, and Designated Consumption Lounges pursuant to Ordinance 2022-11 on September 1, 2022. [8] Detroit's first application window to apply for Phase 1 Limited Licensing for Adult-Use Marijuana Retailer, Micro-business, and Designated Consumption Lounges pursuant to Ordinance 2022-11 closes on **September 30, 2022**. [9] On September 26, 2022, the Michigan Court of Appeals denied the appellants' motion to stay pending their appeal as of right.

---

[6] **Exhibit 5**, Temporary Restraining Order (enjoining Detroit from commencing Phase 1 of the application process on August 1, 2022), *JARS Holding LLC, et. al v. City of Detroit,* No. 22-006534-CZ (6th Cir. Mich. July 29, 2022).

[7] **Exhibit 6**, Order Denying Preliminary Injunction and Dismissing Plaintiff's Complaint, *JARS Holding LLC, et. al v. City of Detroit,* No. 22-006534-CZ (6th Cir. Mich. August 30, 2022); *see also* **Exhibit 7**, Order Granting Immediate Consideration and Denying Motion to Stay, *JARS Holding LLC, et. al v. City of Detroit,* No. 362944 (Mich. Court of Appeals September 26, 2022);

[8] **Exhibit 8**, The City of Detroit, *City to open applications tomorrow for 1st phase of Recreational Marijuana Licenses,* https://detroitmi.gov/news/city-open-applications-tomorrow-1st-phase-recreational-marijuana-licenses (Aug. 31, 2022).

[9] *See supra.*

4

This suit follows to enjoin Detroit from implementing its "second" attempt at an ordinance which remains "far more protectionist than equitable."[10]

## **Parties and Jurisdiction**

1.      Plaintiff Arden Kassab ("Kassab") is an individual domiciled in the state of Michigan.

2.      Plaintiff Pharmaco, Inc. ("Pharmaco") is a Michigan corporation.

3.      Detroit is a Michigan municipality located in Wayne County.

4.      Venue is proper in this Court under 28 U.S.C.§ § 1391 and 1367.

5.      Jurisdiction is proper in this Court under 28 U.S.C § 1331.

## **General Allegations**

### *A.      The Medical Marihuana Facilities Licensing Act ("MMFLA").*

1.      In 2016, the Michigan Legislature enacted the MMFLA.[11]

2.      The MMFLA established a legal-and-regulatory framework for state-licensed businesses to grow, process, and sell marihuana for medicinal purposes ("Medicinal Facility").

3.      To operate under the MMFLA, a Medicinal Facility must obtain (i) a state license from Michigan's Cannabis Regulatory Agency ("CRA"), and (ii) approval from the municipality in which it desires to be located. A Medicinal Facility can locate only in municipalities that permit them.[12]

4.      Under the MMFLA, a Medicinal Facility can sell marihuana only to those who are

---

[10] *See* Exhibit 1 at 15.
[11] 2016 PA 281, MCL 333.27101 to 333.27801.
[12] MCL 333.27205.

5

registered ("Patients") under the Michigan Medical Marihuana Act ("MMMA").

5.      A Patient becomes registered under the MMMA after (i) a licensed physician certifies them, and (ii) they apply to use medical marihuana.

6.      In 2018, Detroit passed an ordinance that permitted 75 Medicinal Facilities.

7.      Pharmaco is an owner of three Medicinal Facilities that operate in Detroit.

8.      Pharmaco also operates a Medical Marijuana grow facility in Detroit.

9.      In connection with these, Pharmaco has invested millions of dollars, improved infrastructure, paid taxes, and employed many Detroit residents at competitive wages.

> **B.      *Michigan Regulation and Taxation of Marihuana Act ("MRTMA").* [13]**

10.     In 2018, Michigan voters passed MRTMA.

11.     MRTMA establishes a legal-and-regulatory framework for operating adult-use recreational, retail cannabis businesses ("Adult Facility").[14]

12.     MRTMA legalizes Adult Facilities in municipalities unless the municipality has prohibited or limited Adult Facilities within its boundaries.[15]

13.     Municipalities that do permit Adult Facilities may require the Adult Facilities to obtain a license from them.[16]

14.     MRTMA regulates the ordinance that a municipality can enact, and it must be consistent with MRTMA and Cannabis Regulatory Agency ("CRA") rules.[17]

---

[13] 2018 IL 1, MCL 333.27951 to 333.27967.
[14] MCL 333.27959.
[15] MCL 333.27956(1).
[16] MCL 333.27956(3).
[17] MCL 333.27956(3).

15.     MRTMA requires municipalities that limit the number of licenses it grants to select the best applicants by using a competitive process that identifies those applicants who are best-suited to operate an Adult Facility that complies with MRTMA.[18]

16.     MRTMA identified 184 communities as intended beneficiaries of its social-equity programs ("Intended Beneficiaries").

### C.     *Medical Marihuana Sales Decline after MRTMA is Passed.*

17.     Nearly everyone familiar with the cannabis industry foresaw that MRTMA would lead to the demise of Medicinal Facilities.

18.     To counter-act their demise, MRTMA guaranteed through 2021 an Adult-Facility license to anyone that already had a Medicinal-Facility license in a city that opted-in and began offering Adult-Facility Licenses.

19.     Medicinal Facilities are doomed, *inter alia*, because Patients do not want to pay to return to their doctor every two years to have their registration re-certified, as required.

20.     As expected, Medicinal-Facility sales have been steadily declining, particularly in comparison to Adult-Facility sales.

21.     From March 2020 to March 2022, the number of Patients in Michigan declined by about 30%.[19]

---

[18] MCL 333.27959(4).

[19] *See* **Exhibit 9,** Michigan Marihuana Regulatory Agency, March 1-31, 2020 Monthly Report (https://www.michigan.gov/cra/resources/cannabis-regulatory-agency-licensing-reports/marijuana-regulatory-agency-statistical-report); *see also* **Exhibit 10**, Michigan Marihuana Regulatory Agency, March 1-31, 2022 Monthly Report (https://www.michigan.gov/cra/resources/cannabis-regulatory-agency-licensing-reports/marijuana-regulatory-agency-statistical-report).

22.     Similarly, in Wayne County, where Detroit is located, the number of Patients has been declining on a monthly basis.

23.     In April 2020, Medicinal-Facility sales actually exceeded Adult-Facility sales in Michigan by over Twenty Percent (20%).[20]

24.     But by April 2022, just two years later, Adult-Facility sales had grown to being more than six times the amount of Medicinal-Facility sales.[21]

25.     Despite Detroit being aware of this, the Second Ordinance takes the opposite approach than MRTMA intended, undermining the protections that MRTMA had included in its acknowledgment of the impending negative consequences to Medicinal Facilities. As a result, Detroit's Second Ordinance will inevitably hasten their demise.

26.     The demise of Pharmaco is inevitable.

### D.     Detroit Opts-in: First Ordinance Found Unconstitutional.

27.     In November 2019, Detroit opted out of adult-use cannabis regulation under MRTMA, but it reversed course one year later and chose to allow Adult Facilities -- it enacted the Medical Marijuana Facilities and Adult-Use Marijuana Establishments ordinance ("First Ordinance").

---

[20] *See* **Exhibit 11,** Michigan Marihuana Regulatory Agency, April 1-30, 2020 Monthly Report (https://www.michigan.gov/cra/resources/cannabis-regulatory-agency-licensing-reports/marijuana-regulatory-agency-statistical-report) (Medicinal-Facility sales were $33,817,309.23; Adult-Facility sales were $27,844,288.08).

[21] *See* **Exhibit 12**, Michigan Marihuana Regulatory Agency, April 1-30, 2022 Monthly Report (https://www.michigan.gov/cra/resources/cannabis-regulatory-agency-licensing-reports/marijuana-regulatory-agency-statistical-report) (Medicinal Facility sales declined about 25% to $27,014,690.99; Adult-Facility sales increased to $167,954,718.80).

8

28.     On March 2, 2021, suit was brought against Detroit, arguing that the First Ordinance violated (i) the Commerce Clause of the United States Constitution, and (ii) the Equal Protection and Due Process Clauses of the Michigan Constitution.

29.     On June 17, 2021, this Court issued an Opinion and Order Granting a Motion for Preliminary Injunction, holding that the First "Ordinance is far more protectionist than equitable."[22]

30.     This Court also found that the plaintiff would be "significantly disadvantaged in applying for a recreational marihuana retail license . . . and, at worst, be entirely eliminated from consideration for such a license."[23]

31.     Detroit went back to the drawing board and emerged with the Second Ordinance. As shown below, though, the Second Ordinance is equally unlawful.

### E.     On April 5, 2022, Detroit Enacts Its Second Ordinance.

32.     About nine months after this Court's Order, Detroit enacted the Second Ordinance.[24]

33.     Detroit limited the number of licenses available for Adult Facilities, and it established a licensing scheme that violates the United States Constitution in multiple ways.

34.     However, the Second Ordinance continues to give the same preferences to long-term residents, only this time calling them "Equity Applicants."

35.     The Second Ordinance authorizes 100 Adult-Facility licenses, 30 microbusiness licenses, 30 designated-consumption establishment licenses. One-half of each category of licenses must be issued to Equity Applicants, but they are eligible for all 100 Adult-Facility licenses; non-

---

[22] *See* Exhibit 1 at pg. 15.
[23] *See supra* at pg. 18.
[24] Exhibit 2.

9

Equity Applicants, however, are only eligible for 50 of the Adult-Facility licenses.[25]

36.     To obtain an Adult-Facility license, the Second Ordinance awards points under five categories; applicants can be awarded up to a maximum of 102 points.[26]

37.     Under the Second Ordinance, Equity Applicants obtain substantial benefits.

38.     The Second Ordinance defines an Equity Applicant as "an individual whose primary residence is located within a disproportionately impacted community ..., including individuals with certified Detroit Legacy Status ...; or an entity where one or more of the aforementioned individuals owns and controls at least 51% of the applicant entity."[27] – so much better!!

39.     The Second Ordinance sets up a scoring system that virtually guarantees that in practice only Detroit Equity Applicants will receive the Adult-Facility licenses.

40.     To ensure a preference to Detroit residents, Detroit revised the State's definition of 'disproportionately impacted communities' by using 2019 census data, as opposed to the 2008-2018 census data relied on by the State in determining the 184 communities intended to benefit from the passage of MRTMA.[28]

41.     By utilizing 2019 data, Detroit guaranteed Detroit residents 25 points or 20% of the available points under the Second Ordinance by its subterfuge; thus, ensuring a preference to Detroit residents and eliminating 67 of the 184 intended communities from even qualifying for social equity points as a "disproportionately impacted community".

---

[25] Exhibit 2 at §20-6-38(a).
[26] Exhibit 2 at §20-6-38(a)(5).
[27] Exhibit 2 at §20-6-2.
[28] *See* Exhibit 4.

42.     Pursuant to the state of Michigan's social equity program, those who have been registered as a primary caregiver under the Michigan Medical Marihuana Act ("MMMA") for at least two (2) years between 2008 and 2017 qualify for social equity.

43.     The Second Ordinance does not allow those with caregiver status under the MMMA to obtain social equity or apply as an Equity Applicant for licenses designated as "equity licenses."

44.     Moreover, the Second Ordinance allows an individual who obtains Detroit Legacy Status to apply for licenses designated as "equity licenses."

45.     Detroit Legacy Status is granted to an entity that is "at least 51% owned and controlled by one or more individuals who have, as certified by the Civil Rights, Inclusion, and Opportunity Department ("CRIO"), been a City of Detroit resident at the time of application for at least one year" or an individual meeting the aforementioned qualifications. Additionally that entity or individual has to have been a City of Detroit resident for: (1) 15 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure; or (2) 13 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and is a low-income applicant at the time of application, as defined in this section; or (3) 10 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and has a prior controlled substance record, as defined in this section, or a parent with a prior controlled substance record [...]."[29]

46.     If an applicant satisfies the Second Ordinance's requirements to be an equity applicant, the applicant is qualified to receive any of the 100 Adult-Facility licenses, including one

---

[29] Exhibit 2 at §20-6-2.

11

of the 50 reserved for Equity Applicants.

47.     This provides preferential treatment for the benefit of Equity Applicants.

48.     The Second Ordinance allocates a maximum of 102 points to applicants, which are awarded based on five categories of criteria: "Business Plan" (25 points); "Site Control" (25 points); "Due Diligence" (25 points); "Community Investment" (25 points); and "Social Equity Scoring Criteria" (27 points).[30]

49.     Under the "Social Equity Scoring Criteria" the Second Ordinance offers 47 possible points, though an applicant may not be awarded more than 27 of these total points.[31]

50.     For Pharmaco to truly compete for an Adult- Facility license under the Second Ordinance, it must obtain social-equity points, which are granted to "non-equity applicants" only if they divest themselves of substantial real property or business ownership interests, as follows:

    a.  Sells real property that is properly zoned and licensable for an adult-use marijuana establishment to an applicant classified as an Equity Applicant within 2 years prior to applying for licensure for less than 50% of the real property's appraised fair market value; **OR**,

    b.  Leases licensable, habitable space to an applicant classified as an Equity Applicant at a properly zoned property (does not have to be the same property for which the non-equity applicant is seeking licensure) for: (i) at least 10 years and at a rate not exceeding 60% of the average market rent for similar commercial or industrial properties in Detroit; or (ii) at least 20 years and at a rate not exceeding 50% of the average market rent for similar commercial or industrial properties in Detroit; **OR,**

---

[30] Exhibit 2 at §20-6-38(a)(5).
[31] Exhibit 2 at §20-6-38(a)(5).

    c.  Forms a joint venture with an applicant classified as an equity applicant where the equity applicant owns and controls 20-50% of applicant equity.[32]

51.     This requirement that Pharmaco divest itself of real property or substantial business ownership to qualify for an Adult-Facility license violates the Constitution.

52.     With a statistical sleight-of-hand, and to increase the probability that Detroit residents would be awarded Adult-Facility licenses, the Second Ordinance eliminated over 36% of the Intended Beneficiaries by erroneously correlating poverty level with the disproportionate impact of marijuana enforcement and prohibition.

53.     The Second Ordinance also doubles the CRA residency requirements to obtain "Detroit Legacy Status" and benefit from the social-equity programs from five cumulative years to a minimum of ten years. This disqualifies more Intended Beneficiaries from the social-equity programs.

54.     Even further still, the Second Ordinance prohibits co-location of Adult Facilities and Medicinal Facilities.

55.     By issuing only 50 licenses to non-equity applicants Detroit is (i) providing preferential treatment to those individuals that live in a community with at least a 20% poverty rate, or (ii) requiring applicants to relocate to a community that the Second Ordinance recognizes as a disproportionately impacted where at least 20% of the population lives below the federal poverty level.[33]

---

[32] Exhibit 2 at §20-6-38(a)(5).
[33] Exhibit 2 at §20-6-38(a)(5).

13

56.     Individuals with marijuana convictions intended to benefit from the additional resources and fee reductions provided by Michigan's Social Equity Program cannot be Equity Applicants if they have not been Detroit residents for at least 10 years and if they do not live in one of the 117 communities out of the 184 communities recognized by the Second Ordinance as a 'disproportionately impacted community'.

### F.     Plaintiffs Cannot Obtain an Adult-Facility License.

57.     Plaintiff Arden Kassab qualifies for the state of Michigan's social equity program for residing in a disproportionately impacted community for at least five (5) cumulative years within the last ten (10) years and for having a marijuana-related felony conviction; however, Kassab cannot obtain status as an Equity Applicant under the Second Ordinance.

58.     Despite operating a Medicinal Facility in Detroit, investing in the city, paying taxes, and employing Detroit residents, Pharmaco cannot obtain an Adult-Facility license.

59.     The Second Ordinance prevents Pharmaco from obtaining an Adult-Facility license because it refuses to grant a license to an applicant that is also a direct or indirect owner of (i) another applicant applying for the same license, or (ii) a licensee that holds the same license.[34]

60.     The Second Ordinance treats Plaintiffs differently from Detroit residents who have, or whose parents have, a controlled-substance criminal record.

61.     The Second Ordinance treats Plaintiffs differently from Detroit residents who have lived in Detroit for 13 of the past 30 years and have a low income.

62.     The Second Ordinance treats Plaintiffs differently from Detroit residents who have

_____

[34] Exhibit 2 at §20-6-38(a)(3).

14

lived in Detroit for 15 of the past 30 years, regardless of income or a controlled-substance record.

63.    Because the Second Ordinance is written in such a way to prevent Plaintiffs, specifically Kassab, from qualifying as Equity Applicants, they will not have a chance to obtain an Adult-Facility license.

64.    At a minimum, the Second Ordinance significantly reduces the number of Adult-Facility licenses for which Plaintiffs can compete.

### G.      *The Second Ordinance Violates the Constitution*

65.    Procedural due process is required by the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

66.    The Due Process clause requires government officials to follow fair procedures before depriving a person of life, liberty, or property.

67.    Before depriving a person of life, liberty, or property, procedural due process requires the government to at least afford the person notice, an opportunity to be heard, and a decision made by a neutral decisionmaker.

68.    These provisions guarantee, among other things, a right to intrastate travel, a right to interstate travel, a right to pursue one's livelihood, and the right to be free from arbitrary or impermissible discrimination.

69.    The Fourteenth Amendment's Equal Protection Clause requires states to govern impartially—to not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.

70.    The Second Ordinance violates these provisions because it grants preferences to

15

Equity Applicants, including Detroit Legacy applicants, in awarding Adult-Facility licenses. This punishes Plaintiffs for exercising their rights, violates their right to pursue a livelihood, and draws distinctions between them and Detroit residents that are not rationally related to any legitimate government purpose.

71.    The United States Constitution empowers the federal Congress "to regulate Commerce ... among the several States."[35]

72.    The United States Supreme Court has long held that this Clause also prohibits state and municipal laws that unduly restrict interstate commerce.[36]

73.    A law that discriminates against interstate commerce is "virtually *per se* invalid, and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."[37]

74.    The Second Ordinance violates the Commerce Clause because it discriminates against out-of-state residents and punishes people for moving between states.

75.    The Second Ordinance has preferences for Equity Applicants, including Detroit Legacy applicants, that do not advance a legitimate local purpose. To the extent they do, that interest could be adequately served by reasonable nondiscriminatory alternatives.

76.    The Second Ordinance violates the Constitution because the scoring method and criteria deters Pharmaco and similarly situated persons from applying for an Adult-Facility license.

---

[35] US Const, art I, § 8, cl 3.
[36] *Tenn Wine & Spirits Retailers Ass'n v Thomas*, 139 S Ct 2449, 2459 (2019); *see also Dean Milk Co v. City of Madison*, 340 US 349,354 & n4 (1951)
[37] *See Dep't of Revenue of Ky v. Davis*, 553 U.S. 328, 338 (2008) (internal quotation marks and citations omitted).

77.     The Second Ordinance violates the Constitution because it prohibits Detroit from issuing more than one Adult-Facility license to a direct or indirect owner.[38]

78.     The Second Ordinance violates the Constitution because it prohibits co-location of Medicinal Facilities and Adult Facilities.[39]

79.     The Second Ordinance's unlawful prohibition on co-location of Medicinal Facilities and Adult Facilities discriminates against Medicinal Facilities.[40]

80.     In sum, Detroit has created a system that gives preferential treatment to its residents, violates the Constitution, and eradicates Medicinal Facilities.

### H.     *Pharmaco will be Irreparably Harmed by the Second Ordinance*

81.     At all relevant times, Pharmaco operated a Medicinal Facility in Detroit.

82.     Pharmaco has a business plan that necessarily includes operating an Adult-Facility.

83.     Adult Facilities have more than 6 times the sales base of Medicinal Facilities.[41]

84.     The industry-wide consensus is that Medicinal Facilities will soon vanish.

85.     If Detroit does not grant Pharmaco an Adult-Facility license, it will undoubtedly have to close its Medicinal Facility.

86.     The harm to Pharmaco will be irreparable.

87.     Pharmaco expended considerable time, effort, and resources to become a Medicinal

---

[38] Exhibit 2 at §20-6-38(a)(3).
[39] Exhibit 2 at §20-6-31(b); §20-6-36(d); *see also* §20-6-2. This also violates MRTMA. MCL 333.27956(5).
[40] MCL 333.26958(3)(c).
[41] *See* Exhibit 12 (Medicinal Facility sales declined about 25% to $27,014,690.99; Adult-Facility sales increased to $167,954,718.80).
[41] *See* Exhibit 1 at pg. 15.

Facility with the understanding that Detroit would soon permit Adult Facilities.

88. Pharmaco will lose its entire business if Detroit implements the Second Ordinance, as operating only Medicinal Facilities is unsustainable.

89. The Second Ordinance's adverse effect on Pharmaco will be irreparable.

## Count I

### (Declaratory Judgment and Injunctive Relief)

90. Plaintiffs incorporate the allegations set forth in the paragraphs above.

91. The Declaratory Judgment Act permits this Court to remedy Detroit's ongoing constitutional violations.[42]

92. Section 1 of the Act provides, in pertinent part:

> In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such.[43]

93. An actual controversy exists if Plaintiffs plead and prove facts demonstrating an adverse interest necessitating the sharpening of the issues raised.[44]

94. There is an actual case or controversy here because Plaintiffs allege that the process that Detroit utilizes to award licenses to operate Adult-Facilities violates the Equal Protection, Commerce, and Due Process Clauses of the United States Constitution.

---

[42] Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.
[43] Declaratory Judgment Act, 28 U.S.C. §§ 2201(a).
[44] *Shavers v Kelley,* 402 Mich 554, 589, 267 NW2d 72, 82 (1978).

**Count 2**

**(Violations of MRTMA)**

95.     Plaintiffs incorporate the allegations set forth in the paragraphs above by reference as if fully set forth herein.

96.     MRTMA requires that Detroit select the best applicants through a competitive process that selects those applicants who are best suited to operate in compliance with MRTMA.

97.     The Second Ordinance violates MRTMA by providing scoring criteria unrelated to the applicants' ability to comply with MRTMA.

98.     Specifically, the Second Ordinance provides different scoring criteria for "Equity Applicants" versus "Non-Equity Applicants."[45]

99.     The Second Ordinance further violates MRTMA by awarding points for "Non-Equity Applicants" for:

     i.     Completing a "Good Neighbor Plan";

     ii.     Obtaining leadership roles in duly established and licensed (if applicable) Detroit-based businesses, nonprofits, religious organizations, educational institutions, philanthropic organizations, community block clubs or neighborhood associations during the previous five (5) years**:**

     iii.     Selling real property that  is properly zoned and licensable for an adult-use marihuana establishment to an equity applicant within two (2) years prior to applying for licensure for less than fifty percent (50%) of the real property's appraised fair market value;

---

[45] *See* Exhibit 2 at §20-6-38(a)(5).

iv.      Forming a joint venture with an equity applicant where the equity applicant owns and controls forty-one to fifty percent (41-50%) of applicant equity;

v.      Leasing licensable, habitable space to an equity applicant at a properly zoned property (does not have to be the same property for which the non-equity applicant is seeking licensure) for at least twenty (20) years and at a rate not exceeding fifty percent (50%) of the average market rent for similar commercial or industrial properties in Detroit;

vi.      Forming a joint venture with an equity applicant where the equity applicant owns and controls thirty-one to forty percent (31 – 40%) of applicant equity;

vii.      Leasing licensable, habitable space to an equity applicant at a properly zoned property (does not have to be the same property for which the non-equity applicant is seeking licensure) for at least ten (10) years and at a rate not exceeding sixty percent (60%) of the average market rent for similar commercial or industrial properties in the city of Detroit;

viii.      Forming a joint venture with an equity applicant where the equity applicant owns and controls twenty to thirty percent (20 – 30%) of applicant equity;

ix.      Joining the Michigan Joint Ventures Pathway Program; and/or

x.      Committing to publishing applicant's Social Equity Plan on State's website.

100.    The Second Ordinance further violates MRTMA by awarding points for "Equity License Applicants" for:

i.      Completing a "Good Neighbor Plan";[46]

ii.      Obtaining leadership roles in duly established and licensed (if applicable) Detroit-based businesses, nonprofits,

---

[46] Exhibit 2 at §20-6-36(a)(14).

religious organizations, educational institutions, philanthropic organizations, community block clubs or neighborhood associations during the previous five (5) years**;**

iii.      Equity applicant's primary residence being in a disproportionately impacted community where at least thirty-five percent (35%) of the population lives below the federal poverty level according to the 2019 American Community Survey 5-year estimates published by the United States Census Bureau;

iv.      Equity applicant's primary residence being in a disproportionately impacted community where at least thirty percent (30%) of the population lives below the federal poverty level according to the 2019 American Community Survey 5-year estimates published by the United States Census Bureau;

v.      Equity applicant's primary residence being in a disproportionately impacted community where at least twenty percent (20%) of the population lives below the federal poverty level according to the **2019** American Community Survey 5-year estimates published by the United States Census Bureau;

vi.      Joining the Michigan Joint Ventures Pathway Program; and/or

vii.      Committing to publishing applicant's Social Equity Plan on State's website.

101.    Plaintiffs will incur damages as a result of Detroit's violation(s) of MRTMA by enacting the Second Ordinance and its scoring criteria.

102.    MRTMA defines "unreasonably impracticable" to mean:

that the measures necessary to comply with the rules or ordinances adopted pursuant to this act subject licensees to unreasonable risk or require such a high investment of money, time, or any other resource or asset that a reasonably prudent businessperson would not operate the marihuana establishment.[47]

---

[47] MCL 333.27953(x).

103.    The Second Ordinance is "unreasonably impracticable" because the scoring method and scoring criteria deter Plaintiffs and other similarly situated parties from applying for adult-use licensure.

104.    The Second Ordinance requires adult-use license applicants to adopt a "Good Neighbor Plan," indicating the applicant's annual commitment to enhancing the community where the adult-use marihuana establishment will be located.

105.    The Second Ordinance requires an applicant to submit a community-outreach report and a community-outreach plan,[48] as well as completing one or more of the following during the term of the license:

> a.    Hiring Detroit residents to comprise at least fifty percent (50%) or more of the applicant's full-time employees who earn at least Fifteen Dollars ($15.00) per hour; or

> b.    Hiring individual that have a prior-controlled substance record and comprise at least thirty percent (30%) or more of the applicant's full-time employees who earn at least Fifteen Dollars ($15.00) per hour; or

> c.    Purchasing at least fifty percent (50%) or more of necessary goods and services from licensed marihuana facilities, Detroit legacy licensees, or other businesses in Detroit; or

> d.    Selling at least twenty-five percent (25%) or more of applicant's available harvest or products to Detroit legacy equity licensees for at a rate that is twenty-five percent (25%) less than Detroit's market rate; or

> e.    Spending at least seven hundred and fifty (750) annual hours serving a Detroit-based tax-exempt charitable organization, community organization, religious institution, pre-K-12 public or charter school, or block club that operates in the community where the applicant's facility is located; or

---

[48] Exhibit 2 at §20-6-2; *see also* §20-6-31(d).

        f.      Donating at least .25% of the applicant's gross revenue to a Detroit-based tax-exempt charitable organization that operates in the community where the applicant's facility or establishment is located, or to a fund that Detroit may establish to fund social-equity initiatives, and substance-use prevention programs.

106.    The Second Ordinance is "unreasonably impracticable" because it prohibits issuance of more than one adult-use marihuana retailer license to any direct or indirect owner.[49]

107.    Pharmaco, therefore, is unable to obtain or maintain interest in more than one adult-use marihuana retailer license.

108.    The Second Ordinance requires Pharmaco to incur a substantial financial loss in order for it to operate in Detroit's adult-use cannabis market, as Pharmaco must either: (1) considerably divest itself of ownership interest in favor of an "Equity Applicant"; (2) sell or lease its real estate at a rate far below market value; or (3) undertake other financial considerations in favor of an "Equity Applicant".

109.    The Second Ordinance is "unreasonably impracticable" as it serves to prohibit co-location, which deters the Plaintiffs and other similarly situated parties from applying for an adult-use license.

110.    Plaintiffs will incur damages a result of Detroit's violation(s) of MRTMA by enacting the "unreasonably impracticable" Second Ordinance.

111.    Michigan law permits Detroit to limit the total number of marihuana establishments, but Michigan law prohibits Detroit from banning medical-marihuana facilities from co-locating

---

[49] Exhibit 2 at §§20-6-38 (e)(4) and (a)(3).

with adult-use marihuana facilities.

112. Detroit's Second Ordinance was meant to limit the total number of adult-use facilities operating in the city of Detroit.

113. Co-location of medical-marihuana provisioning centers with adult-use retailers does not increase the number of facilities, as they operate at the same facility.

114. The Second Ordinance contradicts MRTMA, which prohibits a municipality from preventing a marihuana retailer from sharing an operating location with a medical-marihuana facility.

115. Due to the cap imposed by Detroit concerning the number of available adult-use licenses and ban on co-ownership under the Second Ordinance, the Second Ordinance operates as a prohibition on co-locations and hinders the CRA from licensing co-locating adult-use and medical facilities.

116. Pharmaco operates medical-marihuana provisioning centers that will incur damages as a result of Detroit's violation(s) of MRTMA by prohibiting co-location operations.

## PRAYER FOR RELIEF

Based on the above, Plaintiffs respectfully request that this Court:

A. order a speedy hearing of this action and advance it on the calendar;

B. issue a declaratory judgment that the Ordinance is invalid, at least with respect to the provisions related to favoring Detroit legacy applicants in awarding adult-use retail establishment licenses;

C. issue an injunction enjoining Detroit from accepting applications,

evaluating applications and awarding adult-use retail establishment licenses pursuant to

the Second Ordinance; and/or

      D.      grant such other relief as is just and appropriate.

                Respectfully submitted,

                **Scott F. Roberts Law, PLC**

Dated: September 28, 2022      */s/ Christine L. Constantino, Jr.*
                Christine L. Constantino, Jr. (P80719)
                Attorneys for Plaintiffs
                500 Temple St., Suite 2M
                Detroit, MI 48201
                (248) 234-4060